THE STATE v. McCAHILL.

1. **Criminal Procedure**: JURY: CALLING BY-STANDERS. Where twenty jurors were summoned for the term, and the court excused two, and nine of the remaining eighteen were engaged on another case when this case was called, *held* that it was competent for the court to summon jurors from the by-standers for the trial of this case. (Code, § 4396.)

2. **Criminal Evidence**: MURDER BY CONSPIRATORS: HISTORY OF CONSPIRACY. On the trial of one of a number of conspirators for murder committed in the execution of the conspiracy, it was competent to show the history of the conspiracy from the beginning, even though a considerable part of it occurred before any acts of violence were committed on the part of any one, and before it was certain that any such acts were contemplated; for the character and purpose of the combination before it became unlawful had a tendency to shed light on its acts afterwards.

3. ———: ———: THREATS TO KILL ANOTHER PERSON. In such case, it was proper to admit evidence of threats made by the conspirators to kill another person who was among those against whom the combination was formed, where such threats were made immediately after the killing of the decedent, and were followed by firing in the attempted execution of the threats, and the whole was done in the execution of the single purpose for which the mob was formed; for such evidence tended to show the desperate character of the mob, and that murder was a part of its program.

4. **Criminal Law**: MURDER BY CONSPIRATORS: ALL GUILTY. Where there is a conspiracy to accomplish an unlawful purpose, (as the forcible driving out of newly-employed miners by old miners on a "strike,") and the means to be used are not specifically agreed upon or understood, each conspirator becomes responsible for the means used by any co-conspirator in the accomplishment of the purpose in which they are all at the time engaged; and when a homicide is thus committed, each is responsible for it, the same as if done by himself.

5. **Practice on Appeal**: VERDICT ON CONFLICTING EVIDENCE. A verdict of guilty will not be disturbed in this court for want of evidence on a necessary point, where the evidence on that point is in conflict.

6. **Criminal Evidence**: MURDER BY CONSPIRATORS: PREVIOUS ACTS. On the trial of one of several conspirators for murder committed by the conspiracy, evidence of the acts of violence and the threats of the defendant's co-conspirators, at a time preceding the homicide, was admissible to show the purpose of the conspirators to use violence in the accomplishment of their unlawful purpose.

7. ———: ERROR WITHOUT PREJUDICE. Error in the admission of evidence in a criminal case is no ground for reversal where no prejudice results therefrom.

8. ———: MURDER BY CONSPIRATORS: OTHER OFFENSES. On the trial of one of several conspirators for murder committed by the conspiracy, it is competent to prove other offenses committed in the execution of the purposes and plans of the defendant and those with whom he acted, for the purpose of showing the existence of the conspiracy, and that the homicide was committed in the prosecution of its unlawful purposes.

9. ———: CONSPIRACY: INSTRUCTION. Although there is no direct evidence of a conspiracy to commit the crime charged, yet, if a conspiracy is inferable from the facts established from the testimony, the court may properly instruct the jury on the theory that there was a conspiracy.

10. Instruction: WHOLE CHARGE READ TOGETHER. That an instruction is not full enough is no ground for a reversal where the defect is supplied by another instruction.

11. Criminal Law: CONSPIRACY: GUILT OF ABETTORS. Where a conspiracy arises out of a concert of action simply, and without any previous agreement as to its extent or purpose, the responsibility of any one of the parties thereto ceases, when he abandons the common purpose and withdraws from any concert of action with the others, and withdraws all his aid, countenance and encouragement from the enterprise; but, until he does this, his responsibility continues for the acts of all done in furtherance of the common purpose. But he cannot withdraw his aid and encouragement, and thus escape responsibility for a crime committed in furtherance of the conspiracy, by simply withdrawing from the scene of the crime; for his advice and encouragement, once given, will be regarded as continuing until he withdraws it by acts or words showing that he disapproves or opposes the contemplated crime.

12. Instructions: REPETITION OF RULE OF LAW. There can be no prejudice from the repetition in the instructions of a correct rule of law based on the evidence, where it does not appear that it was brought to the attention of the jury in an improper connection.

*Appeal from Greene District Court.*

FRIDAY, DECEMBER 3, 1886.

THE defendant was indicted for the crime of murder in the first degree. Upon trial he was found guilty of manslaughter, and sentenced to imprisonment in the penitentiary for three years. He appeals.

No appearance for appellant.

*A. J. Baker, Attorney-general,* for the State.

ADAMS, CH. J.—The case is submitted to us upon a tran-

The State v. McCahill.

script of the entire record, without abstract, argument or assignment of errors. We have, however, examined the case as best we could, without the aid of counsel, and will proceed to notice some of the matters which we think it is possible are relied upon for a reversal.

I. The regular panel of jurors summoned for the term consisted of twenty persons, but two had been excused, and the court was proceeding with eighteen jurors. When this case came on for trial, one jury was out deliberating upon its verdict in a case, upon which jury were nine persons belonging to the regular panel, leaving only nine of the panel for the trial of the defendant. The defendant asked the court to delay until those of the regular panel who were out could be in attendance, or that additional persons be drawn from the jury lists. The court refused the request, and ordered the jury to be filled from the by-standers, or from the body of the county. To the action of the court in this respect the defendant excepted. It was competent for the court to discharge two jurors of the regular panel, and proceed with eighteen, if in the judgment of the court the business of the term did not require more. (Code, § 233.) We will presume that in the judgment of the court eighteen were deemed sufficient. A larger number being required when this case came on for trial, it was competent to summon jurors from the by-standers, or the body of the county. (Code, § 4396.)

1. CRIMINAL procedure: jury: calling by-standers.

II. On the night of the 7th of January, 1885, a dwelling-house in the town of Angus, Greene county, was surrounded by a mob, and entered, and one of the inmates, Nels Munson, was shot and killed. The evidence tends to show that defendant was one of the mob, and took an active part in entering the house, but the evidence fails to show that he was the one who fired the fatal shot. The difficulty which resulted in the homicide grew out of a miners' strike. A large number of the coal miners in and about Angus struck, and left their

2. CRIMINAL evidence: murder by conspirators: history of conspiracy.

employment, as early as October, 1884. Various attempts were made by the proprietors of the mines to supply the places of the striking miners by the importation of new men. The plans of the proprietors were constantly interfered with by the striking miners, and many of the new men were caused to leave. Matters, however, did not assume a very turbulent appearance until about the 11th of December, 1884. A considerable number of new men had been imported upon the 10th of that month. The striking miners appeared at once, and requested of the proprietors that they be allowed access to the new men, for the purpose of persuading them to leave. The proprietors acceded to their request, so far as to consent that a committee or representation from the striking miners should have access to the new men, and be allowed to talk to them, and that the new men should, after that, be allowed to act freely in the matter, and stay or leave as they should think best. On the morning of the 11th of December, the striking miners were allowed to present their case to the new men. Many words of persuasion were used to induce them to leave, and a few words of intimidation. But the words of intimidation were not approved by all the striking miners, and some expressly disclaimed any intention of using violence. The new miners, after the interview which was had with them, took a vote, and decided to remain. The result was very unsatisfactory to the striking miners. They began at once to show appearances of anger, and commenced the use of abusive language towards the new men, and to demand admittance into the house where they were, and to assume a threatening attitude towards them. The proprietors were led to believe that they would not, without assistance, be able to protect the new men from violence, and one of them went to a telephone, and communicated with a telegraph station, and asked that a request be sent to the governor for troops. The fact that such message had been sent became known to the striking miners, and their tumultuous assemblage was soon dissolved. To use the language of one

of the witnesses, " it soon melted away." Troops were fur-
nished, but soon withdrew. The withdrawal seemed to fur-
nish an occasion for the renewal of hostilities on the part of
the striking miners.

The evening of the 7th of January was selected as the
time for making an effective demonstration. They assem-
bled in large numbers, and, as the evidence tends to show,
the defendant was among them, taking an active part. They
first assailed a gang of men on their way home at night from
what is called the " Standard Coal Bank." They no longer
resorted to persuasions, but to violence. They wounded sev-
eral of them, and drove them out of the town, and to some
distance away, and the assailed finally took refuge in the
town of Perry. The evidence tends to show that the defend-
ant was not only among the assailants, but used force in com-
pelling the men to leave. The assailants returned in a short
time, and surrounded and entered the house in which Mun-
son was killed. Several shots were fired into the house, and
inside of the house shots were fired up the stairway, in the
direction of the chamber in which some of the inmates had
taken refuge. The mob in the meantime clearly announced
their purpose to compel the new employes to leave their
employment. After the survivors had consented to do so,
the mob retired in a body, but not without threatening, as
they passed away, to take the life of one Markham, who was
present, a superintendent of one of the mines, and several
shots were fired, apparently with the design of carrying out
the threats.

In the course of the trial a very large number of objec-
tions were interposed by the defendant to the admission of
evidence, some of which were overruled. The evidence,
which was admitted over the defendant's objections, tended
to show the history of the trouble as set out above, a consid-
erable part of which took place before there were any acts of
violence on the part of any one, and before it is certain that
any acts of violence were contemplated. But, in our opin-

The State v. McCahill.

ion, it was proper to trace the growth of the conspiracy from the beginning. The character and purpose of the combination before it became unlawful had a tendency to shed light upon its acts afterwards. Of course, if the defendant had withdrawn from the combination before it became unlawful, he would not have become a conspirator; but the evidence tends strongly to show that he did not withdraw, but remained to the end. In view of the whole case, we are unable to say that the evidence objected to was inadmissible.

III. The defendant objected to the admission of evidence of threats to kill Markham. The threats were made after the killing of Munson. But the threats charac-

3. ——: ——: threats to kill another person.

terized the firing which immediately followed, and the whole was done in the execution of the single purpose for which the mob was formed, and that was the prevention of the employment of new men. It tended to show the desperate character of the mob, and that murder had been made a part of its programme.

IV. The court gave an instruction in these words: "It is proper for you to consider the situation fully, as the evi-

4. CRIMINAL law: murder by conspirators: all guilty.

dence develops it; the trouble, if any, which existed between the old miners and their employers; the fact, if it is a fact, that a strike existed among the old miners, and the extent and purpose thereof; the conduct of the striking miners towards the new ones, and all other acts of the parties, in so far as they are shown, and are shown to be within the knowledge of the defendant, but no others. The conduct or declarations of other parties, except such as are shown to be in the presence of the defendant, are not competent as against him to establish either the existence of a conspiracy, or the defendant's connection with it; but if a conspiracy is shown, and the defendant's connection with it as one of the conspirators is established, then the act of any one, done in carrying out the purpose of the combination, is competent, as against the defendant, and binding on him, the same as if done by himself."

We have set out the foregoing instruction partly for the purpose of showing the guarded manner in which the jury was instructed in regard to the application of the evidence, and partly for the purpose of noticing a rule of law to the correctness of which we presume that the defendant's counsel do not assent. In the absence of all argument, we are not permitted to know what their position is, but we presume that they rely largely upon the fact that it does not appear from the evidence that the defendant was the one who did the shooting, or that it was understood by him that any one was to be murdered. Perhaps the most that the jury could have inferred from the evidence was that the defendant had formed, with others, a combination to forcibly compel the new men to leave their employment. We think that they might have inferred this much, because the evidence tends to show that the defendant actually used force in compelling others to leave on the same evening, and the evidence shows, beyond controversy, that the combination designed that all should leave. We think that this much can be said in regard to the defendant's designs, and perhaps not much more. It is possible, then, if not probable, that he contemplated driving out Munson, and those with him in the house which was mobbed, in the same way in which the miners from the Standard coal bank had been driven out about two hours before, and fire-arms had not been resorted to in the case of those miners. But where there is a conspiracy to accomplish an unlawful purpose, (as the forcible driving out of the new miners was,) and the means are not specifically agreed upon or understood, each conspirator becomes responsible for the means used by any co-conspirator in the accomplishment of the purpose in which they are all at the time engaged. See 1 Bish. Crim. Law, § 636, and cases cited.

Whether, in case the defendant was not the one who fired the fatal shot, he was guilty of the same *degree* of crime as the one who did, we need not determine. The defendant was convicted only of manslaughter. The most which the

instruction held was that, if the defendant was engaged in the conspiracy in which the homicide was committed, the act of homicide was binding upon him, the same as if done by himself. By this the court evidently meant that the defendant would not properly escape conviction for the act. The degree of his guilt was a different question, and as to that we need not, under the verdict, express any opinion.

We have examined the entire record, and find no error.

AFFIRMED.

SUPPLEMENTAL OPINION ON REHEARING.

TUESDAY, JUNE 21, 1887.

*W. W. Phillips* and *McDuffie & Howard*, for appellant.

*A. J. Baker, Attorney-general* for the State.

BECK, J.—An opinion was filed in this case at a prior term, affirming the judgment of the court below. No abstract, assignment of errors or argument in behalf of defendant having been presented, a rehearing was granted, with the assent of the attorney-general; and the cause has been again submitted upon an abstract and argument, both oral and printed, on behalf of defendant. We proceed to the further consideration of the case, so far as to dispose of all questions raised by counsel in their arguments.

I. The facts in the case are clearly, fully and correctly stated in our former opinion, and no further statement thereof need be attempted. This opinion, it cannot be denied, shows that, although the case was before submitted without argument, it had careful, deliberate and thorough consideration by this court.

5. PRACTICE on appeal: verdict on conflicting evidence.

Counsel for defendant begin the discussion of the case with this frank admission, which is a correct statement of a controlling rule of the law applicable to the case: "We concede that, if the defendant was present at Keystone No.

2 (the locality of the homicide) on the night of the 7th of January, and acting in concert with the body of men who were there for the purpose of frightening or driving Munson and his co-laborers from the mine, his conviction is right, although he did not fire the shot which killed Munson." But counsel maintain that the evidence fails to support the facts on which this admission is based. It surely cannot be said that there is no evidence tending to show defendant's presence at the place of the homicide, and his action in concert with others for the purpose of driving away Munson and the other laborers. The evidence tends to show that defendant, from the beginning, co-operated actively in efforts to drive away these men; that he was associated in sympathy and interest with those engaged in the unlawful purpose, and was among the leaders in the enterprise; that there was a prearrangement as to the purpose, and action in concert to accomplish it; and that defendant was present at the place of the homicide, acting with the other conspirators. It is true that there was evidence, on the part of defendant, in conflict with the testimony introduced by the state, tending to establish these facts.

It cannot be said that, upon this conflicting evidence, the jury, in the honest, intelligent and unbiased exercise of their discretion, could not have found the facts in question which establish defendant's guilt. We cannot, therefore, under familiar rules prevailing in this court, interfere with the judgment on the ground of the insufficiency of the evidence to support the verdict.

II. Evidence was introduced by the state, against defendant's objection, tending to prove the acts of violence and threats of the strikers, with whom defendant was associated, at a time preceding the homicide. We think the evidence competent to show the purpose of the strikers to use violence in order to accomplish their unlawful purposes. As defendant acted in con-

6. CRIMINAL evidence: murder by conspirators: previous acts.

cert with the other strikers to effect the purpose common to all, the evidence was competent to establish that purpose.

III. Certain evidence was introduced showing a conversation between two employes connected with the coal mines, at the time of the troubles, in which the opinion was expressed to the effect that there was danger of the violence resulting in bloodshed. We confess that the pertinency and relevancy of the evidence does not plainly appear. It may be possible that it would serve to show the nature and extent of the violence. But we are unable to discover any prejudice that could have resulted to defendant from the admission of the evidence, and therefore we cannot regard it as reversible error.

7. ——: error without prejudice.

IV.. A witness for defendant, upon his cross-examination, was asked certain questions tending to show the feelings, as to the strikers, of one who accompanied him to the scene of the homicide shortly after it occurred. As in the case of the evidence just noticed, we are unable to discover its pertinency. But it appears that no prejudice to defendant resulted therefrom. It is not, therefore, a ground for reversing the judgment.

THE SAME.

V. The state was permitted to show an assault upon the new miners, made an hour and a half before the homicide, by the striking miners in whose company defendant was. This violence was at a mine a mile and a half distant from the place of the homicide. We think the evidence was rightly admitted. It tended to show the nature and extent of the conspiracy, and defendant's connection with it.

8. CRIMINAL evidence: murder by conspirators: other offenses.

VI. Many other objections are urged to the rulings of the district court upon questions relating to the admission of testimony. Some of these objections are based upon the ground that the evidence objected to tends to establish "other offenses." They tend to show unlawful acts done in the execution of the plans and purposes of the defendant, and those with whom he acted in con-

THE SAME.

cert; thus tending to show the existence of a conspiracy, and that the homicide was done in the unlawful prosecution of its plans and purposes. We think other objections to the testimony demand no special attention.

VII. It is insisted that certain instructions are erroneous for the reason that there was no evidence given to which they are

9. ——: con- applicable. They relate to the existence of the
spiracy: in-
struction. conspiracy, which was not proved by direct evidence, but was inferable from the facts established by the testimony. It cannot be said that there was no evidence supporting an agreement among the strikers to commit violence in order to accomplish their purposes.

VIII. An instruction informing the jury of the ways in which a conspiracy may arise did not direct them that the

10. INSTRUC- thing which they conspired to do must be unlaw-
TION: whole
charge read ful, or be done by unlawful means. But another
together. instruction clearly presents this thought. The instructions, read together, present the correct rule to the jury.

IX. An instruction complained of by defendant is in the following language: "(10) But in the second case, where a

11. CRIMINAL conspiracy arises out of a concert of action simply,
law: conspir-
acy: guilt of and without any previous agreement or compact
abettors. as to its extent or purpose, the responsibility of any one of the parties thereto would cease when he abandoned the common purpose and withdrew from any further concert of action with the others, and withdrew all his aid, countenance and encouragement from the enterprise; but his responsibility for the acts of all, done in furtherance of the common purpose, would continue until he did this.

"Accordingly, if the evidence in this case is such as to lead you to believe that a large body of these striking miners, including this defendant, assembled together on January 7th, without any specific agreement or understanding as to what they would do; that they united in attacking the men from the Standard mine, and drove them away; that defend-

ant took part in such attack, but that, when the same was ended, he withdrew from the crowd, and withdrew all his aid, countenance and encouragement in any further action; that he neither went to Keystone No. 2, nor aided, encouraged nor advised the others in going there; and that previous to their going there the defendant had withdrawn entirely from any and all concert of action with the others, and had withdrawn all his aid, countenance and encouragement from the enterprise,—he will not be responsible for any acts of the other parties after he had so severed his connection with them; and, if you find this to be the state of the case, the defendant should be acquitted. But if he went to Keystone No. 2, and assisted in attacking the house where Munson and his comrades were; or if he did not in fact go there himself, but if he advised, aided or encouraged others to go there, for the purpose of driving or taking the new miners away, and in the prosecution of that purpose the house where Munson and the other new miners were was attacked and fired into by them, and Munson was killed by any of such shots,— the defendant will be liable, with all the others so engaged with him, for such killing."

This instruction correctly presents the law applicable to the responsibility of a conspirator after he becomes identified with the conspiracy. His guilt, if he did not personally aid in the commission of the unlawful act, consisted in the encouragement he gave thereto. If he advised and directed the unlawful acts, he cannot escape responsibility by quietly withdrawing from the scene. His guilty act was the encouragement and advice he gave those who committed the crime. The influence and effect of this encouragement continued until he withdrew it by acts or words showing that he disapproved or opposed the contemplated crime. He cannot, by the coward's expedient of running away after he has incited his associates to crime, escape punishment.

X.   Counsel think the court erred in repeating, in three

or four instructions, the thought that defendant is guilty if
he aided, abetted or encouraged others to commit
the crime, even though he was not present.    The
rule announced cannot be questioned, and we can

**12. INSTRUC-
TIONS : repe-
tition of rule
of law.**

discover no possible prejudice resulting to defendant from
its repetition.    It does not appear to us that it was brought to
the attention of the jury in an improper connection.

The. foregoing discussion disposes of all questions argued
by counsel.

Upon the further careful reconsideration of the case, we
remain well satisfied that the judgment of the district court
ought to be                                    AFFIRMED.