## STATE OF IOWA v. J. C. YETZER, Appellant.

**Fraudulent Banking:** STATUTE CONSTRUED. McClain's Code, sections 1824 and 1825, provides that if any bank shall receive or accept any deposit when insolvent, any officer or managing party thereof, knowing of such insolvency, who shall knowingly permit the receiving of any such deposit as aforesaid, shall be guilty, etc.

*Held,* that an officer of an insolvent bank, who, knowing of its insolvency, permits or connives at the receiving of deposits, is guilty of the offense described, whether he is a managing party or not.

SAME. It is not necessary, to constitute a violation of such statute, that the deposit must be received in the bank building or rooms, but the receipt of money on deposit for the bank, outside of its room, is sufficient.

SAME. Nor is it necessary, to constitute a violation of such statute by an officer of the bank, who does not personally receive the

deposit, that the person actually receiving it knows that the bank is insolvent, where such officer knows it, and allows such person to receive it for the bank.

SAME. Where an officer of a bank, knowing the bank to be insolvent, assists, advises, etc., the keeping of the bank open for the receipt of deposits, and while it is so kept open, a particular deposit is received, such officer is guilty of a violation of such statute, though the money is actually received by another, and though said officer has no knowledge of any particular deposit.

**Instructions Construed Together.** Do not charge that one may, under a specific indictment, be found guilty of fraudulent banking under McClain's Code, 1824-1825, if it appears, only, that he connived generally at an insolvent bank's receiving deposits.

**Evidence:** HARMLESS ERROR. In a prosecution for fraudulent banking, defendant, on cross-examination, was asked, as touching his expenditures, if there had not been a bastardy proceeding against him a few years before, that cost him a great deal of money to settle. After the examination proceeded for some time, the court struck out the testimony, as too remote. *Held*, that, though the evidence should not have been offered, defendant was not prejudiced.

REBUTTAL—DISCRETION. The court which tries a criminal case may, in its discretion, admit testimony in rebuttal which the state might properly have offered in chief, where such testimony contradicts testimony offered by defendant.

**Notice of Testimony.** In a prosecution for fraudulent banking, a notice by the state that it would on the trial introduce certain witnesses whose names were not on the indictment, stated that it expected to prove by such witnesses that a certain bank was, on a certain day, a bank of deposit, and defendant was a stockholder, and director, and managing party thereof; that it was insolvent; and that defendant permitted, and connived at, the receiving of deposits, etc. *Held*, that such notice complied with Code, section 4421, providing that the state shall not use a witness whose name is not indorsed on the indictment, unless defendant is given notice in writing, stating the name, etc., of the witness, and the *substance* of what it expects to prove by him on the trial.

SAME. *Held*, that the evidence of such witness need not be limited strictly to the matters stated in such notice, where the departure is not such as to be evasive of the law.

**Presence of Witness:** CONSTITUTIONAL LAW. Constitution, article 1, section 10, providing that in all criminal trials the accused shall have the right to have compulsory process for his witnesses, does not apply to witnesses who, though residents of the state, are beyond the reach of compulsory process of the court.

**Challenge of Juror:** WAIVER. The overruling of a challenge for cause, is not prejudicial, where defendant waived a peremptory challenge by which the juror might have been excused.

SAME. It is held, that a juror was qualified to sit, notwithstanding newspaper comment, which he had read and the impression that it had made upon him.

*Appeal from Cass District Court.*—HON. WALTER I. SMITH, Judge.

WEDNESDAY, APRIL 8, 1896.

INDICTMENT for fraudulent banking. Verdict of guilty, and judgment, from which the defendant appealed.—*Affirmed.*

*Jacob Sims* and *John Hudspeth* for appellant.

*Milton Remley,* attorney general, *H. M. Boorman,* county attorney, and *Swan & Bruce* for the state.

GRANGER, J.—Haywood and Albert were jurors on the trial of the indictment. Mr. Albert, in answer to questions as to his qualifications to sit, said: "Have seen Mr. Yetzer; know him; but have formed no opinion about case. Could try it impartially without reference to anything I have heard about it." On cross-examination he said: "I take the *Atlantic Telegraph.* Read it." At this point counsel read to the jurors several articles published at Atlantic, where the Cass County Bank was located, with regard to which the fraudulent banking is charged. We copy two of the articles as fairly indicating the tenor of all. They are as extreme as any in their statements, and if we treat them as indicating the general tenor of the articles, it is certainly fair to the appellant. They are as follows:

"Hold Fast to the Right. The *Telegraph* wants to add a word to what it has repeatedly said about the

creditors of the Cass County Bank keeping right on their side, not violence. The dispatches which have recently gone forth from Atlantic to the metropolitan dailies, do injustice in presuming a strong desire to violence. They want their money or justice. Think of it! Hundreds of thousands of dollars belonging to an honest, hard-working people, swept away,—worse than swept away. It has been squandered and sequestered by men in whom they placed a superb confidence. This crime has phases worse than robbery, worse than burglary, worse than the operations of the bunco bandit or faro dealer. These men feel that their money has been wrung away from them by the arts of thievery in the guise of friendship. The amount of these losses is startling, and the creditors feel that the money has been used in private schemes and extravagancies. This is exasperating. The amount of the loss is exasperating, the character of the loss is exasperating. But, still, these creditors, smarting under the method and extent of their robbery, want no violence. They want every cent available. They want justice. They'll have justice. One other thing: It has been said that this failure would hurt Atlantic and community for a long time. That is not so."— *Atlantic Telegraph.*

"Great excitement was created Saturday morning by the currency of the rumor that the president of the defunct bank, J. C. Yetzer, was preparing to leave the city. A mob of two hundred persons, quickly gathered at the depot to intercept his escape. As the train was pulling out, the cry was raised, that Yetzer had been smuggled on board. The train was stopped after it had got out of the yards, and detained for ten minutes, while a search was made. It was the limited, and a great protest was made by the trainmen. Their search was fruitless, and Yetzer was shortly afterward found in a box car, where he had concealed

himself, and the crowd yelled to hang him."—*Press Dispatch*.

The juror was then examined as follows: "Q. You heard me read those newspaper articles to Mr. Ruggles, did you not? Albert: Yes, sir. Q. You read these articles, then? A. Yes, sir; I read something similar to that. Don't know as they had any effect on me. I have known the editor of the *Telegraph* ten years. Would place as much reliance upon his word, as upon that of any ordinarily truthful man. These articles did not cause me to think bank officials innocent. Q. You think you can read articles in newspapers, in which men are charged with being robbers and despoilers of widows and orphans,—a paper you take into your family,—and read these things, without having any influence on your mind? A. I felt sorry for them, when I read them. Q. That is, you felt sorry for the widows and orphans. A. Yes, sir; and all the people who lost money. Q. When you read that women had lost money in the bank,—women who had churned in calico dresses, and carried eggs to town,—that aroused your sympathy, didn't it, for those women? A. Yes, sir; I felt sorry for them. I thought it was so at the time. My opinion at that time was inclined against all the officers of the bank. Nothing has occurred since to cause me to change my opinion. Re-examined by county attorney: I have no opinion as to whether Yetzer was president of the bank at the time charged in the indictment, or whether the bank was insolvent, or whether he knew it, or whether he is guilty of the crime of fraudulent banking. Have no prejudice against any of the bank officers. Wouldn't be influenced by anything other than the evidence. Re-cross-examination: Am fifty-two years old. It would take evidence to remove my opinion that there had been mismanagement, or misappropriation, in the bank,

which I said I had formed.    When I heard evidence, I could lay aside the impression.    Re-examination:    Q. Do I understand you to say that this impression relates to the guilt, or innocence, of the defendant in this case?    A. Well, my impression is that I could do justice either way, if I could hear the evidence.    My impression relates to the Cass County Bank officers generally.    Re-cross examination:    I think bank was insolvent when it went into the hands of receiver." The court overruled a challenge to the juror, and complaint is made to the ruling.    It was manifestly right. The ruling has undoubted support in several cases. *State v. Munchrath,* 78 Iowa, 268 (43 N. W. Rep. 211); *State v. Smith,* 73 Iowa, 32 (34 N. W. Rep. 597); *State v. Vatter,* 71 Iowa, 557 (32 N. W. Rep. 506); *State v. Weems,* 96 Iowa, 426 (65 N. W. Rep. 387).    See, also, *Basye v.    State* (63 N. W. Rep. (Neb.) 811).    Of the cases we cite from Iowa there is not one that is not absolutely conclusive of this point.    As to the juror, Haywood, the showing in favor of his qualifications is not so apparent, but, under the authorities cited, there was no error in the ruling.    However, for another reason, the ruling would not be prejudicial error.    Defendant waived a peremptory challenge, by which the juror, Haywood, might have been excused.    It is said in argument that but one such challenge was waived, and that it was not sufficient to excuse both Haywood and Albert. But it was sufficient to excuse Haywood.    As to Albert, the ruling is so conclusively right, and his competency so well established, that his retention could, in no proper sens, serve as an excuse for not excusing Haywood peremptorily.    *State v. Elliot,* 45 Iowa, 486.

II.    The state served on the defendant, notice that it would, on the trial, introduce witnesses whose names were not on the indictment.    Of such witnesses A, W

Dickerson was one, and it is said that as to him, as well as others, that they were permitted to give testimony as to matters, the substance of which was not stated in the notice. It is, in fact, contended that the notice stated only legal conclusions, so that facts could not legally be proven thereunder. The part of the notice relied on as stating the substance of the facts expected to be proven by the witnesses, is as follows:

"That the plaintiff expects to prove by said witnesses and parties above mentioned, that the said Cass County Bank was, on and prior to December 27, 1893, a bank of discount and deposit, located in Atlantic, Cass county, Iowa; that said defendant, and each of said defendants, were stockholders and directors in said bank, and were the managing parties thereof; that during the months of June, July, August, September, October, November, and December, 1893, the said bank sold to divers parties drafts which were not paid, but were dishonored and protested, and that during said months the said Cass County Bank was wholly insolvent, and was unable to meet and pay its current demands and liabilities in the usual course of business, all of which was well known to the defendants, and each of them; that when said Cass County Bank was insolvent, as aforesaid, the said defendants, and each of them, permitted and connived at the receiving of deposits by A. W. Dickerson in said bank; that on the twenty-seventh day of December, 1893, Theodore G. Steinke was appointed receiver of said bank, and now has in his hands the assets of the same; and that on and prior to December 27, 1893, the liabilities of said bank were largely in excess of its assets." By Code, section 4421, it is provided that the county attorney shall not use such witness on the trial of an indictment "unless he shall have given to the defendant a notice in writing, stating the name, place of residence, and occupation of the witness, and the substance of

what he expects to prove by him on the trial, at least four days before the commencement of the trial." We think the notice is a compliance with the statute. The county attorney was not required to state the details of the testimony to be offered, but the substance of what he expected to prove. The notice states the main facts, towards which the testimony would be directed. The notice is not like that in *State v. Kreder*, 86 Iowa, 25 (52 N. W. Rep. 658). In that case the notice stated no particular facts to be proven, but, in effect, stated that it was expected to prove by the witness that the defendant was guilty. In this notice the defendant is informed that the witnesses will be used to show the existence of the bank, the character of the bank, who were its stockholders and officers, what the bank did, that it was insolvent, and that the defendant permitted and connived at the receiving of deposits, etc., acts upon which a verdict of "Guilty" might, to a greater or less extent, rest.

As to the question, that the witness, Dickerson, and others, were permitted to give testimony as to facts not included in the notice, we think the record does not sustain the claim. The notices unmistakably inform the defendant that the witnesses will testify to facts bearing upon the solvency or insolvency of the bank, which would involve minor details, such as its assets, their kind and character, the liabilities of the bank, the relations of the defendant to the bank, his doings in connection with it, and knowledge as to it, and knowledge of what others were doing. But if it be conceded that there was something of a departure from the notice, still there is no error involved. In *State v. Rainsbarger*, 74 Iowa, 196 (37 N. W. Rep. 153), it is said: "If the state were required to produce evidence, conforming in every important particular to the notice, the statute would defeat justice, when a non-compliance in unimportant matters would not

prejudice the rights of the accused." Later, in *State v. Craig*, 78 Iowa, 637 (43 N. W. Rep. 462), the court, on the trial of the indictment, permitted a wider departure from the facts stated in the notice, and we held, basing our conclusions on the holdings as to the right of the court to permit a witness to give testimony as to facts not disclosed by the minutes of his testimony before the grand jury, that the holding was not erroneous. It is thought by appellant that the same holding should not obtain in the two cases. It is difficult to see why. The purpose of returning the minutes of the testimony in the one case, and stating the substance of it in the other, must be for the same purpose as to the defendant. The minutes of the testimony to be returned seems a memorandum, or record of it, which is certainly as comprehensive as stating the substance of it; and if, on principle, the departure is authorized in the one case, it should be in the other. What might be the holding where, in either case, the departure was such as to be evasive of the law, we need not determine, for no such case is before us.

III. The point is made, that appellant's motion in arrest of judgment, should have been sustained, because Haven, who made the deposit, for the receipt of which the indictment was returned, knew the bank was insolvent, and hence was not deceived or defrauded. We need not determine what would be the effect of such knowledge when making a deposit, for the reason that no such fact appears in this case. It does appear, that on the nineteenth day of December, 1893, Haven bought three drafts from the bank, which were afterward returned protested, and were never paid, and that the deposit in question, was made on the twenty-seventh day of the same month; but when the drafts were returned, so that he had knowledge of the insolvency, does not appear.

IV. After the examination of Mr. Dickerson, for the state, the defendant desired the presence of Mr. Julian Phelps, for the purpose of contradicting some parts of the testimony of Dickerson. Mr. Phelps, although a resident of Cass county, where the trial was had, was then in Hot Springs, Ark., for his health, and the defendant moved the court to postpone the trial for two weeks, for his return, which the court declined to do, but suggested that the state should waive time for the taking of depositions, which was done, and his deposition was obtained, and read on the trial. It is now argued that, as Mr. Phelps was a resident of the county where the trial was had, and only temporarily absent, the state could not compel the defendant to proceed without the personal presence of the witness; the claim being based upon section 10, article 1, of the constitution of the state, as follows: "In all criminal trials, the accused shall have the right * * * to have compulsory process for his witnesses." That constitutional guaranty was not denied, nor was it sought. The court had no power to compel the attendance of a witness from Arkansas, even though a resident of Iowa. The constitution nowhere guaranties to a defendant in a criminal trial, a right to the personal presence of his witnesses on the trial, that are beyond the reach of compulsory process. To what extent, or under what circumstances, he is entitled to such a right, where witnesses are within the state, it is not now necessary to determine. It is easy to be seen how readily the administration of justice might be thwarted, if the defendant, in such a trial, could rightly demand the presence of a witness, whose presence the court had no power to compel. Appellant refers to some language in *Trulock v. State*, 1 Iowa, 515. Some argumentative language is employed in the case, as expressive of the views of one member of

the court, touching the right of a defendant to the presence of his witnesses, but it does not appear that the witnesses were beyond the reach of process, nor is there an intimation, direct or remote, that in such case the right could be effectually claimed. We think, the action of the court was manifestly fair to defendant, and that no legal right was denied.

V. To show defendant's knowledge of the condition of the bank, A. W. Dickerson, for the state, testified that on a certain Sunday in June, 1893, he and the defendant were together in the bank, examining the bills receivable. Defendant, in his own behalf, as a witness, denied the facts as testified to by Dickerson, and on rebuttal, the court permitted Thomas Dickerson and Mrs. A. W. Dickerson to testify to having seen defendant and A. W. Dickerson in the bank on a certain Sunday in June, of that year. The court, however, declined to permit them to testify as to what they were doing. It is urged that the testimony was not proper in rebuttal, and to test the correctness of the position, the query is put: Would such evidence have been proper in chief on behalf of the state? We have no doubt that it would. But, conceding that the evidence was not strictly rebutting, the court did not exceed its proper discretion. It often happens on a trial, that a party may reasonably suppose that a fact *prima facie* shown on the direct examination, will stand as unquestioned on the trial, with other evidence at hand to sustain it. In such a case, if it is contradicted, the court may properly permit the other party to offer additional evidence. It is a discretionary matter. See *Hess v. Wilcox*, 58 Iowa, 380 (10 N. W. Rep. 847), and cases there cited. In the Code of Civil Practice (section 2779) the order of presenting evidence is prescribed. The party having the burden must first produce his, then the other party his, and

it is then said: "The parties will then be confined to rebutting evidence, unless the court, for good reasons, in furtherance of justice, permits them to offer evidence in their original case." The same rules obtain in criminal cases, as far as applicable. Code, section 4556. We think the court properly exercised its discretion. See also, *State v. Munchrath*, 78 Iowa, 268 (43 N. W. Rep. 211); *State v. Watson*, 81 Iowa, 380 (46 N. W. Rep. 868).

VI. On cross-examination of the defendant, he was asked, as touching his expenditures, if there had not been a bastardy proceeding commenced against him a few years before, that cost him a great deal of money to settle. This examination was pursued at some length, until the court, discovering that the facts were too remote, struck out all such evidence, on motion of defendant. We have read that part of the evidence with care, and, while we think it should never have been offered, we are satisfied that its presentation before the jury, and its exclusion, were without prejudice.

VII. The following is the part of the indictment important for the consideration of the next question presented: "Being then and there engaged in the banking business, as president of the Cass County Bank, the owners of said bank being to these grand jurors unknown, located and doing business as a bank of deposit, in the city of Atlantic, in the county of Cass, and state of Iowa, did, as president of said bank, as aforesaid, unlawfully, willfully, knowingly, and feloniously permit, connive at, encourage, accept, and receive, on and for deposit in the said bank, known as the Cass County Bank, as aforesaid, a certain deposit in money, currency, bank bills, and United States treasury notes, a more particular description of which is to these grand jurors unknown, of and in the sum of seventy-one dollars, of and from

one, S. N. Haven, being then and there the property of the said S. N. Haven, and of the value of seventy-one dollars, the said bank being then and there insolvent, and the said J. C. Yetzer, defendant aforesaid, well knowing the said bank was insolvent." The sections of the Code (McClain's), under which the indictment is laid, are as follows:

"1824. No bank, banking house, exchange broker, deposit office, or firm, company, corporation, or party, engaged in the banking, broker, exchange or deposit business, shall accept or receive on deposit, with or without interest, any moneys, bank bills, or notes, or United States treasury notes, or currency, or other notes, bills or drafts circulating as money or currency, when such bank, banking house, exchange broker, or deposit office, firm or party, is insolvent.

"1825. If any such bank, banking house, exchange broker, or deposit office, firm, company, corporation or party, shall receive or accept on deposit any such deposits as aforesaid, when insolvent, any officer, director, cashier, manager, member, party, or managing party thereof, knowing of such insolvency, who shall knowingly receive or accept, be accessory, or permit or connive at the receiving or accepting on deposit therein, or thereby, any such deposits as aforesaid, shall be guilty," etc.

It is thought that defendant cannot be found guilty under this indictment, because his guilt must depend upon his permitting, or conniving, at the receiving, or accepting, of the deposit by others, as it does not appear that he himself received, or accepted, it. Appellant then states his construction of the law as follows: "Appellant's contention is that the legislature used this word, 'manager,' advisedly, intending thereby to embrace within the enumeration of persons to be punished who might actually receive, or accept, the deposits all persons

connected therewith, including the managers thereof, and that it intended to punish for permitting, or conniving, thereat, only those who are 'managing parties' of the bank." Appellant was an officer, and it is as such that he is charged with the violation of the act. If we drop from the latter section such words as are evidently unimportant to the point we are considering, we can better discover the true import of the language, and the following seems to be the essential language to be considered: "If any bank * * * shall receive, or accept, on deposit any such deposits as aforesaid, when insolvent, any officer * * * or managing party thereof, knowing of such insolvency, who shall knowingly * * * permit, or connive, at the receiving, or accepting on deposit, therein, or thereby, any such deposit as aforesaid, shall be guilty," etc. The language is that any officer, or managing party, who shall permit, or connive, shall be guilty. Appellant's contention would make the law read as follows: "Any officer, being a managing party, who shall permit, or connive at, etc., or any officer and managing party." The form of expression in the act is disjunctive. Appellant's construction would make it conjunctive. It is thought that the use of the terms "manager," and "managing party," aids appellant's view, as otherwise there is no purpose in the use of both terms. The legislative purpose was, evidently, to be comprehensive, so as to omit from the provisions of the act none who might be parties to the fraudulent acts, and in some cases there are persons entitled "manager," and in others persons doing the same duties, but not so entitled, and hence they would be embraced in the term, "managing party." We think such to be the legislative purpose in the use of the two terms.

VIII. It is thought that the jury was swayed by passion and prejudice. The record does not so indicate.

The bank was in the extreme of insolvency. The defendant was its president, and the fact of insolvency was known to him. He knew that the bank was receiving deposits, and of its inability to pay. The evidence to show that he permitted, and connived, at the receipt of deposits, including that for which he stands indicted, is so strong that no man, unprejudiced, could doubt his guilt. What might have been his individual purposes and motives is another question, and they may be considered in fixing the degree of punishment. But of the fact of his having permitted the receipt of deposits, knowing the bank to be insolvent, there is no doubt, and the verdict has abundant support.

IX. The following is the second paragraph of the court's instructions: "Our statutes provide that no party, firm, or corporation engaged in the banking business, shall receive or accept on deposit any moneys, bank bills, United States treasury notes, or currency, when such party, firm, or corporation is insolvent; and that, if any such party, firm, or corporation be insolvent, every such party and every officer of such corporation who knowingly receives or accepts any such deposit, or is accessory to, or permits or connives at, the receipt or acceptance thereof, knowing of such insolvency, shall be guilty of felony. The defendant is indicted under this statute." There is a complaint of the instruction in that it does not state that the deposit must be received in the insolvent bank. We take this to mean that it must be received in the bank building or rooms. The law does not so define the crime. Referring to section 1825, it will be seen that the crime consists, as applied to a bank, or any other of the institutions named, in the deposit being received "therein or thereby." It is not to be thought that the receipt of money on deposit for the bank, if done outside its rooms, or what is usually

termed "the bank," when speaking of the place, would not be an offense. The word "bank," as used in the act, is not thus limited. Under the language of the act, if the deposit is received by the bank, it is sufficient.

X. The same criticism is made as to the third instruction, and it is further said, that it does not state that the person actually receiving the deposit, must have known that the bank was insolvent. The law only requires such knowledge on the part of the party charged with the offense. If an officer of a bank, with knowledge of its insolvency, directs a clerk, without such knowledge, to receive deposits, and they are so received, the ignorance of the clerk does not affect the guilt of the officer who directs the act to be done. It is not the act of the clerk in receiving the deposit that constitutes the crime, but the act of the officer, in directing it. The clerk does not commit the crime, and hence the doctrine of accessories has no application, as appellant seems to think.

XI. The following is the sixth instruction given: "It is not necessary for the state to show that defendant received the deposit in question. The evidence upon this point is sufficient, if you find therefrom that the bank was insolvent to defendant's knowledge, and that it accepted said deposit while so insolvent to his knowledge; that at that time he was president of said bank, and as such, did connive at, or was accessory to, the receipt of such deposit—that is, *the evidence upon this point is sufficient, if it appears therefrom, that defendant, knowing the bank was insolvent, did aid, assist, advise, or encourage keeping it open for the receipt of deposits."* The italicized language is said to involve error. It is said that the defendant was not charged generally, with conniving at the receipt of deposits in an insolvent bank, knowing it

to be insolvent. The argument takes no note of the first part of the instruction, wherein the rule of the instruction is made to apply to the particular deposit and the particular time; and nothing in the instruction warrants a conclusion that the defendant was being tried for conniving at the receipt of deposits generally. It is said that the jury was told that proof that the defendant aided or assisted, encouraged or advised, keeping the bank open for deposits generally, knowing that it was insolvent, would be sufficient evidence that he connived at, or was accessory to the receipt of, the deposit from S. N. Haven, upon which the indictment is based. The main thought of the instruction is that there can be a conviction without proof that defendant, in person, received the deposit. It then states, as the law, that if defendant, knowing the bank to be insolvent, did aid, assist, advise, etc., keeping it open, for the receipt of deposits; and if, while it was so kept 'open for deposits, the particular deposit, because of which the defendant was indicted, was received, it would be sufficient to show the defendant guilty. We understand that to be the correct rule. It is not essential that the defendant should have had in mind the particular deposit, or that he should have known of it. If, as has been stated, he knew the bank to be insolvent, and with that knowledge he did any of the things specified as to receiving such deposits knowingly, he would be guilty, under the statute, even though he had no knowledge of any particular deposit. In such a case, he would aid, or connive, at the receiving of every deposit so received.

Some of the questions argued are not to be considered, because of the condition of the record as to the evidence. There is a stipulation, by which it appears that certain affidavits, relied upon to sustain

certain propositions argued, were neither preserved by bill of exception nor certificate of the judge. Upon as full a consideration of the case as is warranted, in view of its importance and the judgment imposed, we are led to the conclusion that the case is free from reversible error, and the judgment is AFFIRMED.